IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES DENNIS DORBOR,

               Plaintiff,

  v.

THE UNITED STATES OF AMERICA,
JEFFERSON SESSIONS, ELAINE DURK,
JAMES McCAMENT, THOMAS CIOPPA,
and KAY LEOPOLD,

               Defendants.

OPINION and ORDER

17-cv-676-jdp

---

Plaintiff James Dennis Dorbor is a citizen of Liberia seeking to be naturalized as a United States citizen. His application for citizenship has been denied by the U.S. Citizenship and Immigration Service (USCIS), and he turns to this court for de novo review of that decision, as provided under 8 U.S.C. § 1421(c).

The government contends that Dorbor was erroneously granted status as a legal permanent resident (LPR) in 2009, and because he did not qualify for LPR status then, he does not qualify for citizenship now. The parties agree that Dorbor qualified when he *applied* for LPR status because his wife had asylum status. The question is whether he still qualified after he and his wife divorced, which was after he applied but before his application was granted. Both sides move for summary judgment. Dkt. 17 and Dkt. 20.

The facts of this case are undisputed, and the decisive issue is the interpretation of 8 U.S.C. § 1159(b)(3), which states that an asylee may not adjust to the LPR status unless the applicant "continues to be a refugee . . . or a spouse or child of such a refugee." § 1159(b)(3). The question is whether the word "continues" refers to the time the application was filed or to the time the agency decided the application. In isolation, § 1159(b)(3) is ambiguous; both

Dorbor and the government propose reasonable interpretations of the statue. But the text, purpose, and history of the statute as a whole, as well as related immigration statutes and case law, support Dorbor's view. The court will grant Dobor's motion for summary judgment and deny defendants' motion. This makes it unnecessary to consider Dorbor's alternative argument that he is entitled to relief because the USCIS failed to adjudicate his application in a reasonable time.

UNDISPUTED FACTS

The following facts are undisputed.

Dorbor is a citizen of Liberia. He married Garmai Stubblefield in Liberia in 1987. In 2001, Stubblefield entered the United States and successfully applied for political asylum. Stubblefield applied to have Dorbor and their three children admitted to the United States as derivative asylees. Dorbor was admitted to the United States as a derivative asylee in 2004.

Dorbor applied, pro se, for an adjustment to LPR status on May 5, 2006. Dkt. 23-3. Dorbor's relationship with his wife had deteriorated, and apparently Dorbor and Stubblefield did not live together in the United States. In his application for adjustment, Dorbor listed his marital status as "divorced." *Id*. at 4. But Dorbor did not formally divorce Stubblefield until October 29, 2007, through a petition to the Liberian government.

Dorbor was interviewed in connection with his application for adjustment to LPR status on February 9, 2009. He explained his marital situation to the USCIS agent. Notes on the application suggest that Dorbor had clarified during his interview that he was "separated" at the time of his application. Dorbor was granted LPR status on February 13, 2009, nearly three years after he filed his application. Dorbor remarried in November 2009.

Dorbor applied for naturalization, with legal representation, on January 14, 2014. He was interviewed by a USCIS agent on October 15, 2014. Dorbor's application was denied in a written decision dated March 2, 2016. Dkt. 23-5. The bases for the 2016 denial were that Dorbor was divorced at the time of his application for adjustment to LPR status, and that his marriage to Stubblefield was not bona fide. Dorbor requested reconsideration and a hearing. Dkt. 23-6. After two further hearings, the USCIS reaffirmed the denial in a decision dated May 8, 2017. The sole basis for the ultimate decision in 2017 was:

> In your case, according to your testimony and your documentary evidence, the petition ceased to be valid because you divorced your petitioning spouse before your adjusted status.

Dkt. 23-7.[1]

Dorbor's petition to this court followed.

ANALYSIS

Under 8 U.S.C. § 1421(c), Dorbor is entitled de novo review in district court of the denial of his application for naturalization. The question is whether Dorbor has met his burden to show that he meets the statutory requirements for naturalization. *Berenyi v. Immigration & Naturalization Serv.*, 385 U.S. 630, 636–37 (1967). The district court has no equitable authority to naturalize applicants who are ineligible under the law. *Immigration & Naturalization Serv. v. Pangilinan*, 486 U.S. 875, 885 (1988). Dorbor requests an evidentiary hearing in his complaint,

---

[1] Because the agency ultimately did not find that the marriage was fraudulent and the government doesn't develop an argument that it is entitled to relief on that ground, the court will not considered that issue further. Dorbor's marriage to Stubblefield was not a happy one, but the record shows that it was a bona fide marriage.

but no hearing is needed because the facts are sufficiently developed and the material facts are undisputed.

At issue in this case is 8 U.S.C. § 1159, which allows refugees who have been granted asylum to apply for an adjustment of status to that of a lawful permanent resident. The five requirements for adjustment are stated in subsection (b):

> (b) **Requirements for adjustment** The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who—
>
> (1) applies for such adjustment,
>
> (2) has been physically present in the United States for at least one year after being granted asylum,
>
> (3) continues to be a refugee within the meaning of section 1101(a)(42)(A) of this title or a spouse or child of such a refugee,
>
> (4) is not firmly resettled in any foreign country, and
>
> (5) is admissible (except as otherwise provided under subsection (c)) as an immigrant under this chapter at the time of examination for adjustment of such alien.
>
>> Upon approval of an application under this subsection, the Secretary of Homeland Security or the Attorney General shall establish a record of the alien's admission for lawful permanent residence as of the date one year before the date of the approval of the application.

8 U.S.C. § 1159(b).

As explained above, the dispositive issue is the meaning of "continues" in subsection (b)(3). Dorbor contends that the word means that the applicant must be an eligible refugee, or the spouse or child of a refugee, at the time of application. The government contends that

4

(b)(3) requires that the applicant remain an eligible refugee, or the spouse or child of a refugee, until the status adjustment decision is made. Neither side cites any precedent directly on point, and the court has found none.

Statutory interpretation begins with the text of the statute, and it ends there if the meaning is plain. *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). The terms of the statute should get their "ordinary and popular sense," unless they are specially defined. *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). Statutory construction is a "holistic endeavor," that should account for the statute's full text as well as its structure and subject matter. *Trustees of Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Leaseway Transp. Corp.*, 76 F.3d 824, 828 (7th Cir. 1996).

Neither side points to any agency interpretations of (b)(3) to which the court must defer or that otherwise provide useful guidance.[2] A USCIS policy manual states that "[a] derivative asylee must continue to meet the definition of a spouse or child of a refugee both at the time of filing and final adjudication of the adjustment application."[3] As Dorbor contends, and the government apparently concedes, the manual is entitled deference based only on its

---

[2] The agency has promulgated a regulation related to § 1159(b)(3), but it is nearly identical to the statute. The only difference is the addition of a comma and the word "is." 8 C.F.R. § 209.2(a)(iiii) (alien may not be admitted for permanent residence unless he or she "[c]ontinues to be a refugee within the meaning of section 101(a)(42) of the Act, or *is* the spouse or child of a refugee") (emphasis added). The addition of the comma and that verb "is" in the regulation raises the question whether the verb "continues" even applies to the requirement that the applicant be "the spouse or child of a refugee." But there is no explanation for why the agency added a different verb to the second clause and neither side relies on the regulation, so the court will not consider it.

[3] *See* U.S. Citizenship and Immigration Services, "Policy Manual," *available at* https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume7-PartM-Chapter2.html.

5

"power to persuade." *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Because the manual doesn't provide any reasoning for its interpretation, it has no persuasive power.

The government says that (b)(3) is unambiguous in requiring that the applicant remain eligible until the status adjustment decision is made. But the government does not conduct any textual analysis of its own. Instead, it relies instead on two cases, *Bazzi v. Ashcroft*, 118 F. App'x 953, 957 (6th Cir. 2004), and *Siwe v. Holder*, 742 F.3d 603 (5th Cir. 2014), but neither is on point. In *Bazzi*, the court concluded that an immigrant was ineligible for adjustment to LPR status because he engaged in marriage fraud. The court quoted (b)(3) as part of its explanation for why Bazzi could not apply for a status adjustment, but it did not construe the word "continues."

In *Siwe*, the question was whether an asylee who had his asylum status terminated could nevertheless apply for adjustment of status to LPR. The court concluded that Siwe was "an alien granted asylum," even though he later lost asylum status. The court concluded that being "an alien granted asylum" was not a continuing-status requirement. As part of its reasoning, the court pointed to subsection (b)(3), as an example of a continuing-status requirement. But *Siwe* did not address the question whether applicant had to continue in refugee status to the point of decision.

Because there is no case law on point, the court will conduct its own analysis of the text. Subsection (b)(3) does not expressly state how long an applicant must "continue" to be a refugee or the spouse or child of a refugee. And, in isolation, one reading of the word "continues" would suggest that the applicant must "continue" to be a refugee's spouse throughout the application process until a decision is reached. But reading § 1159(b) as a whole supports a different reading. *See Maracich v. Spears,* 570 U.S. 48, 65 (2013) ("It is necessary

and required that an interpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning.").

It is useful to consider (b)(2) and (b)(3) together. Under these provisions, LPR status may be available to one who "has been physically present in the United States for at least one year after being granted asylum" and "continues to be a refugee . . . or a spouse or child of such a refugee." Paired with (b)(2), the most natural reading of (b)(3) is that the immigrant must "continue[] to be a refugee . . . or a spouse or child of such a refugee" *for at least one year after being granted asylum.* In other words, the word "continues" refers to the time between the grant of asylum and the filing of the application, not the time between filing the application and receiving a decision.

This reading of the relationship between (b)(2) and (b)(3) is consistent with legislative history of the Refugee Act of 1980, which first enacted § 1159. A Senate Conference Report explains that the original purpose of the "continues to be a refugee" requirement in § 1159(b) was to account for the possibility that conditions in the refugee's home country would change after asylum was granted. S. REP. 96-256, 1, 1980 U.S.C.C.A.N. 141, 149–50 ("If conditions have changed in the refugee's home country so that he would no longer be subject to persecution upon return, adjustment would not be available."). This principle was directly reflected in the Refugee Act of 1980, which allowed the Attorney General to terminate asylum status if conditions in the asylee's home country had changed so that the person would no longer qualify as a refugee. Public Law 96-212, § 101(b).

Other parts of § 1159(b) also support the view that the application and not the adjustment decision is the relevant point in time. Subsection (b)(1) refers to an alien who "*applies* for [an] adjustment," not to an alien who "applied" for an adjustment at some point in

7

the past. *See Carr v. United States*, 560 U.S. 438, 448 (2010) ("[W]e have frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach."). Again, (b)(2) requires the applicant to be "physically present in the United States for at least one year after being granted asylum." The only reasonable reading of (b)(2) is that the immigrant cannot *apply* for adjustment of status until he has been in the United States for one year. If it was time of the decision that mattered rather than the time of filing, (b)(2) would be meaningless. *See River Road Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 651 (7th Cir. 2011) ("[C]anons of statutory construction urge courts to interpret statutes in ways that make every part of the statute meaningful."). As this case shows, it can take much longer than one year to render a decision. And even if the delay in Dorbor's case was unusually long, an applicant has no way of knowing how long it will take the agency to make a decision, so he wouldn't know when he could first file an application.

There is one requirement in § 1159(b) that clearly relates to an applicant's status at the time of the agency's decision. Specifically, (b)(5) says that the applicant must be "admissible . . . as an immigrant at the time of examination for adjustment." And it makes sense that an applicant would have to meet that requirement up until the approval of his application. The reasons that an immigrant may be "inadmissible" include criminal conduct, terrorist activities, and affliction with a communicable disease. 8 U.S.C. § 1182. Unlike an applicant's divorce, these are issues that raise serious concerns about the applicant's suitability for LPR status regardless of when they occur.

The more important point is that (b)(5) is evidence that Congress made its intention clear when it wanted the agency to consider events that occurred after the filing of the application. The fact that (b)(3) omits such language is further textual support that an

8

applicant satisfies that subsection if he is married to an asylee at the time he files his application. *See Dean v. United States*, 556 U.S. 568, 573 (2009) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (internal quotations omitted)).

The textual clues in § 1159(b) may not be conclusive evidence of the meaning of "continues" in (b)(3), but the government has pointed to no contrary evidence. And adopting Dorbor's interpretation would also make (b)(3) consistent with other similar immigration provisions. This is relevant because one of the primary purposes of the Refugee Act of 1980 (of which § 1159 is a part) is to put refugees on the same footing as other immigrants. S. REP. 96-256, 1, 1980 U.S.C.C.A.N. 141, 142 (one of the statute's "basic objectives" is to "repeal[] the current immigration law's discriminatory treatment of refugees" and "accord[] refugee admissions the same immigration status given all other immigrants").

The Child Status Protection Act, Public Law 107–208, made age at application the critical point for several immigration provisions. To cite one closely related example, under 8 U.S.C. § 1158(b)(3)(B), it is age at application rather than age at adjudication that determines whether a child is eligible for asylum as a derivative asylee:

> **Continued classification of certain aliens as children**
>
> An unmarried alien who seeks to accompany, or follow to join, a parent granted asylum under this subsection, and who was under 21 years of age on the date on which such parent applied for asylum under this section, shall continue to be classified as a child for purposes of this paragraph and section 1159(b)(3) of this title, if the alien attained 21 years of age after such application was filed but while it was pending.

Section 1158(b)(3)(B) is distinguishable from § 1159(b)(3) because § 1158 includes express language directing the agency to consider the date of application. But, as Dorbor points out, courts have construed a different statute, 8 U.S.C. § 1255(d), the same way despite more ambiguous language. *See Carpio v. Holder*, 592 F.3d 1091 (10th Cir. 2010); *Choin v. Mukasey*, 537 F.3d 1116 (9th Cir. 2008). Section 1255(d) permits individuals with certain types of visas to seek permanent residence if they are in the country "as a result of the marriage of the nonimmigrant (or, in the case of a minor child, the parent) to [a] citizen."

In *Choin*, the court considered whether the applicant must be married as of the date of application or the date of adjudication under § 1255(d). In *Carpio*, the court considered the same question but in the context of determining when a child must be a minor. In both cases, the court acknowledged that the language of the statute did not give a clear answer, but in both cases the court concluded that the date of application was controlling. Both courts reviewed the language and purpose of the statute and found nothing that would compel a contrary conclusion. And both courts observed that basic principles of fairness favored a date-of-application approach. Specifically, if the date of adjudication were controlling, it would lead to arbitrary decisions. Applicants have little control over how long the agency takes to adjudicate an application, so they should not be penalized because of changes that occur "while their application for adjustment of status languishes in the agency's file cabinet." *Choin*, 537 F.3d at 1121.

Although § 1255(d) and § 1159(b) use different language and apply to different types of immigrants, the reasoning in *Choin* and *Carpio* is instructive. As in those cases, the government hasn't pointed to any text, purpose, or history of § 1159(b)(3) that supports its more restrictive reading of the statute. In fact, the government hasn't pointed to any
10

immigration statute that expressly requires the agency to determine marriage status at the time of adjudication or any court that has construed a statute that way. And the same concerns about fairness that applied in *Choin* and *Carpio* apply in this case as well. The government hasn't identified any legitimate government interest that is served by construing § 1159(b)(3) to render an application invalid simply because the applicant's marital status changes after filing.

The court concludes that Dorbor's interpretation of § 1159(b)(3) is correct, and that the grant of his application for adjustment to LPR status was properly granted. And, as that was the only impediment to his naturalization, the USCIS wrongly denied his application for naturalization.

ORDER

IT IS ORDERED that

1. Plaintiff James Dennis Dorbor's motion for summary judgment, Dkt. 17, is GRANTED and defendants' motion for summary judgment, Dkt. 20, is DENIED.

2. Defendants are directed to approve Dorbor's application for naturalization.

3. The clerk of court is directed to enter judgment in favor of Dorbor and close this case.

Entered March 29, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge